UNITED STATES *v.* KRAFT PHENIX CHEESE CORP. ET AL. (NO 4164)[1]

United States Court of Customs and Patent Appeals, November 28, 1938

*Webster J. Oliver*, Assistant Attorney General (*Daniel I. Auster*, special attorney, of counsel), for the United States.

*B. A. Levett* for appellee.

[1] C. A. D. 21.

[Oral argument October 11, 1938, by Mr. Auster and Mr. Levett]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

JACKSON, Judge, delivered the opinion of the court:

This is an appeal by the Government from the judgment of the United States Customs Court, First Division, one judge dissenting, reversing the judgment of the single reappraising judge, who held the dutiable value of certain Roquefort cheese to be the foreign value, as found by the appraiser at the port of New York, under section 402 of the Tariff Act of 1930, and not the export value contended for by appellees under the same section. The case involves seven appeals, reappraisements 114681–A and 114690–A being test cases, the others being so-called duress entries.

The pertinent portions of the said section are as follows:

SEC. 402. VALUE

(a) BASIS.—For the purposes of this Act the value of imported merchandise shall be—

(1) The foreign value or the export value, whichever is higher;

\*      \*      \*      \*      \*      \*      \*

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

(d) EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

The difference between the appraised foreign and claimed export values is 200 francs per 100 kilos.

The trial court set out clearly the issue and the contentions of the parties as follows:

It is the contention of the importer, that at the time of exportation of the cheese here involved, viz, from January 16, 1935, through March 13, 1935, the foreign-market value of this particular character of cheese was 1,100 francs plus packing, except as to the Sheep brand and the Bee and Star brands which were slightly higher due to the fact that they are better known. This contention is based upon the allegation that this Roquefort cheese "has been specially made by a special formula, so that it can be commercially and profitably cut into

portions, and that it is known as Portion quality Roquefort," as distinguished from the Ordinary or so-called Standard quality of Roquefort cheese, upon the basis of which the appraiser made his appraisements. The Government, on the other hand, claims that both Portion quality Roquefort and Ordinary or Standard quality, if not identical in character, are similar within the meaning of section 402 (c) of the Tariff Act of 1930, and that the foreign value as found by the appraiser, being higher than the value for export, must prevail.

The importer concedes that at the time of exportation of the cheese in suit Standard or Ordinary Roquefort cheese had a foreign value in France, which was the value found by the appraiser herein.

The issue is thus narrowed down to the question as to whether the Roquefort cheese now before us, all of which is described by the importer as Portion cheese, is identical with or similar to Standard or Ordinary Roquefort cheese. If it is identical or similar the appraised values of 1300, 1315, and 1350 francs per hundred kilos plus packing for the various brands, should prevail; if it is not, the importer's claimed values of 1100, 1115, and 1150 francs per hundred kilos, plus packing should be sustained.

The record consists of the testimony of two witnesses for the appellees, one for the Government, three affidavits introduced by appellees and seven special reports, by Treasury attachés, introduced by the Government.

After an analysis of the conflicting evidence, the trial court found that the imported merchandise was similar to the "Standard" quality of Roquefort cheese and decreed the dutiable values to be those found by the appraiser.

Upon appeal, the appellate division reversed the judgment of the single reappraising judge, and held that the "Portion" quality Roquefort cheese was not similar to the "Standard" type and that the proper dutiable value was the export value. This appeal raises the question as to whether there is substantial evidence to support the judgment of the appellate division.

Appellees contend that the appeal should be dismissed for lack of jurisdiction stating that the assignments of error do not raise any question of law. Counsel for the appellees reviews in his brief the various assignments. Among them, assignment 14 reads as follows:

In finding and holding contrary to law and contrary to the evidence and *the weight of the evidence* that the imported cheese is "not such or similar" to cheese freely offered for sale in the usual wholesale quantities and in the ordinary course of trade to all purchasers in the markets of France for home consumption. [Italics supplied by counsel for appellees.]

Appellees contend that the inclusion of the words "and the weight of the evidence" destroys the efficacy of the assignment in that this court is precluded by statute, in reappraisement cases, from weighing the evidence. Their reasoning is that if an assignment is partially bad the whole assignment must be disregarded. With this conclusion we cannot agree. The first part of the assignment reads: ·

In finding and holding contrary to law and contrary to the evidence * * *.

This language properly raises an issue of law that we can decide. The words "and the weight of the evidence" may be disregarded by us as surplusage. *Nicolopole* v. *Love,* 39 App. D. C. 343. Furthermore, while this court requires a precise statement of the issues appealed from in the assignments of error it is not inclined to be technical or captious. In *José A. Montemayor e Hijos* v. *United States,* 24 C. C. P. A. (Customs) 7, T. D. 48288, the court said:

We find ourselves in agreement with the conclusion of the appellate division as to the sufficiency of the Government's assignments of error. The same refinements of reasoning and technical rules cannot be indulged in customs litigation, and, especially, in reappraisement proceedings, that obtain in general litigation under the rules of the various federal circuits and of the Supreme Court. The rules of the United States Customs Court and *of this court allow more liberality in order that the purpose of the creation of these courts may be accomplished, namely, a speedy litigation of contested matters between the Government and the taxpayer, with a minimum of technical requirements.* * * * [Italics supplied.]

We are of opinion, that while assignment 14 is not as precisely drawn as it might be, and while the other assignments are not the models of form to be expected from painstaking attorneys, nevertheless, they properly raise the issue in this case. See also *United States* v. *J. L. Galef,* 18 C. C. P. A. (Customs) 180, T. D. 44377.

The evidence shows that for several hundred years past a particular kind of cheese has been made in Roquefort, France. This cheese is made from the milk of sheep. The general process of making has been to curdle, heat, salt, and shape the curdled milk into loaves, circular in form, and weighing about five pounds each, after which it is sent to the caves in Roquefort for curing. In the wholesale trade it is practically always sold in loaf form.

In the caves the loaves develop a characteristic mould which grows from moulded bread crumbs put into them before they go into the curing or maturing process.

The record further shows that up until a relatively recent date there was but one kind of Roquefort cheese. There were different qualities as there are in all natural products. Until the advent of "Portion" type, Roquefort cheese consisted solely of a type now known as "Standard." It could not be cut satisfactorily because it crumbled. The crumbling was due to the accumulation of mould in the heart of the loaf, which mould broke off when the knife passed through it. This "Standard" cheese is still made, and there is evidence to show that it was sold, at the time of the present importations, for home consumption, at a higher price than the claimed value of the "Portion" type imported into the United States. There was, and is, a large market for Roquefort cheese in this country, but much of the trade evidently demands that it be capable of being cut into wedge-shaped portions. The "Standard" type could not be so cut without resulting in a ragged, broken product.

One of the witnesses for appellees testified that he was the general manager of Société Auxiliére and general agent for export of the Roquefort Cheese Association. The former body acts as factor for the sale of the products of the latter. While his chief duties were the promotion of sales in the United States, the witness testified that he was personally familiar with the basic process of making Roquefort cheese. He stated that American dealers complained to him that what is now known as "Standard" Roquefort was not satisfactory because it crumbled when cut into portions.

In order to overcome this difficulty experiments were made during a period of approximately three years. Finally, the makers, by reason of a new treatment of the milk and different curing, solved the problem and produced a cheese of firmer texture and less mould, capable of being cut with little or no crumbling. The product became known as "Portion" cheese. It was first shipped regularly to this country in 1934. Today, the record indicates, it is the only type of Roquefort cheese imported here.

The witness in pointing out the difference between "Standard" quality and "Portion" Roquefort, said:

As I said before, Roquefort cheese is made under certain specifications of the French law which call for the use of sheep's milk and curing in the caves. A growth of mold develops, which makes the inside texture of the cheese more or less brittle, according to the amount of mold within the cheese. Before this Portion business developed the internal texture of the cheese was a material provided that would be edible and satisfactory to the people's taste and appetite. When you got that type of cheese which we call a standard Roquefort, which was manufactured for centuries, it when cut breaks up. To cut into portions which are one ounce and a quarter, three-quarters of an ounce, even, to make a satisfactory operation you must have a cheese that is going to have a certain consistency. Therefore, the Portion quality cheese has got a firmer body than the standard quality Roquefort.

\* \* \* \* \* \* \*

So as to get that firmer body that is going to be satisfactory for those portions the cheese itself must be manufactured in a different way, because the cure is the ultimate result, after all, of the manufacture. In the manufacture of Roquefort cheese from sheep's milk first comes the curdling of the cheese—the rennet in the milk which makes it curdle. The second point is the salting; third point is the curing itself within the cellars for the mold to develop within the cheese. To make that firmer-bodied Portion quality Roquefort cheese the experiments showed that first of all the temperature of the milk for the curdling when the rennet is put in had to be different, second, the salting also. The salt provides the rind. There is no actual rind, but the harder surface of the Roquefort cheese. And thirdly, within the caves the control of the growth of the mold had to be run different. The longer the cheese stays in the caves, the more mold growth, except on certain occasion where cheese comes from poor milk, or that, but as a rule it is just only the matter of the duration of the stay in the caves.

But within the caves there is another treatment which is very important. The mold grows from the outside of the caves, and so that it can penetrate, that mold must be scraped off after it has been getting overgrown on the surface of

the cheese, so it can still penetrate, because otherwise it would remain just a surface mould that would eat up the cheese slowly but would not penetrate. This is what we call "revirage," which is, after all, scraping. Well, if you are going to get a firm-bodied cheese, in addition to the difference in the setting of the milk, in addition to the salting, and all this, you have to have first a very much shorter stay within the caves and less scrapings, which means quite a difference in cost. Those scrapings have got to be done every two weeks, and it needs a lot of help, because the cheese only weighs 2½–5 pounds—20 kilos, and it takes a lot of surface to scrape off. That is where the difference comes in, with the ultimate result a cheese which will be edible, which will be commercially satisfactory for general consumption but which when it comes to cutting will have an entirely different texture, an entirely different resistance in the handling; won't break off in the center, where there would be a lot of mold in standard Roquefort and it breaks up at the end. That would have to be thrown away, because it doesn't make any of these portions.

So there is in the finished product quite a difference. There is in the manufacture quite a lot of difference for the ultimate result to be achieved, which involves certain savings in the handling of the cheese, from the setting of the milk until the cheese is finished, ultimately scraped for forwarding.

Appellant in its brief sets forth the issue and certain concessions by both parties as follows:

The sole issue is whether or not the imported so-called "Portion" cheese is *similar* to the "Standard" Roquefort cheese sold in France for home consumption.

The importer concedes the appraised values represent the dutiable values of "Standard" Roquefort cheese sold in France for home consumption. For purpose of this appeal, the Government concedes the entered values represent the dutiable values of the imported "Portion" cheese, provided it is *not* similar to the "Standard" cheese.

Appellees agree with the language of the issue as set forth, but state that all this court is asked to do by the appellant is "to review a finding of *fact* made by the court below * * *." We deem it fairly inferable that appellant intends the issue to be whether the record contains substantial evidence to sustain the judgment appealed from on the question of similarity, and our decision will be made accordingly.

The interpretation of the term "similar" in a reappraisement sense, has been made in a long line of decisions by this court, most, if not all, of which have been cited in the briefs. The case of *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T. D. 42714, is the leading case on the interpretation of "such and similar" merchandise in regard to reappraisements. The meaning there attached to the term "similar" has been repeatedly approved by this court in later decisions.

In that case we held:

In view of the common meaning of the word "similar" and of the authorities cited, we are of opinion, and so hold, that if goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used, ordinarily, they are similar within the meaning of

section 402 (b). The importer or foreign manufacturer may not, by making a few changes in structure, or in giving the product a new name, or by restricting its sale to the American purchaser only, *ipso facto* remove his merchandise from section 402 (b), the foreign value provision.

It is conceded that "Standard" and "Portion" Roquefort cheese are made of the same materials. However, there is evidence to show that there is a difference in the method by which they are made. The record shows that the different cheeses are subjected to different degrees of heat. In addition, there is a difference in the salting, cave temperature, mould scraping and length of time in the curing process. The record for appellees show that this difference of treatment results in a different kind of cheese. This conclusion is logical. The same initial materials may be used in the manufacture of many different things, the difference in the resulting product being caused by the varying treatment to which the materials have been subjected.

There is strong evidence that the "Standard" type crumbles when cut and that all Roquefort cheese shipped to this country must be capable of being cut into portions.

In a broad sense, of course, the ultimate use of both types may be said to be the same. They are both eaten as Roquefort cheese. But there is testimony to the effect that "Portion" cheese is made so that it may be cut satisfactorily and that otherwise it could not be used to make up portion packages.

As to adaptability to the same use, appellees' proof shows that the Standard Roquefort is not adapted to the use or purpose for which "Portion" Roquefort was specially prepared after long research, i.e., capability of being smoothly cut.

The dates of exportation herein were from January 16, 1935, through March 13, 1935. Attached to the affidavits in evidence, submitted by appellees, are a number of certified copies of invoices of actual sales for home consumption of both types of cheese from December 12, 1934, to March 27, 1935. The record of sales, appearing thereon, to one Sovedipa of "Portion" cheese at 1,100 francs per 100 kilos was not considered by either of the tribunals below as tending to prove a home market value for "Portion" cheese because of the restrictions surrounding the sales. In this respect the court below stated:

An examination of said invoices supports the aforesaid statements in the affidavits revealing the fact that all the invoices marked A attached to both affidavits (Collective Exhibits 1 and 3) are made out to Sovedipa as purchaser; that the invoices in Collective Exhibit 1 are marked with the designation "qualite speciale portions" and those in Collective Exhibit 3 with the designation "qualite coupé," these two expressions evidently being the French equivalents for "portion quality"; that the prices on each invoice are 1,100 francs per 100 kilos, except as to one invoice in each exhibit in the latter part of March 1935 where the price is 1,025 francs per 100 kilos. Invoices to other purchasers than Sovedipa also attached to the two affidavits (and which invoices bear no designations to indi-

cate "portion" cheese and therefore presumably referred to the type of cheese "standard") have prices running from 1,300 francs per 100 kilos upward, except as to the invoices dated in the latter part of March 1935 where the prices run from 1,030 to 1,060 francs per 100 kilos, thereby corroborating the testimony of the witness Cassou that on March 20, 1935, there was a considerable drop in the price of both the "standard" and "portion" types of Roquefort cheese. On all the invoices attached to the affidavits whether designating portion cheese or without such designation the term "sur choix" is employed, thus corroborating the testimony of the witness Cassou that said term is not used to differentiate between "standard" and "portion" types, but is equally applicable to both.

These sales, evidenced by these invoices to Sovedipa, at 1,100 francs per 100 kilos for portion cheese, do not constitute a free open home market value for portion cheese because of the special and peculiar circumstances and restrictions under which he was permitted to sell it in France, but they tend to show that it was a different type of cheese from standard cheese.

We agree with the court below that documentary exhibits of appellees constitute evidence of there being two different types of Roquefort cheese.

The court below continued:

Taken as a whole the evidence for the plaintiffs, standing by itself, establishes the fact that the "portion" cheese here involved at the time of importation is different from the so-called "standard" Roquefort cheese in that there is a lesser mould content and firmer texture, irrespective of whether this is due to special treatment as claimed by the plaintiffs or merely the result of arresting the process of making the "standard" type as asserted by the defendant, which in either case would result in a lesser cost of production and reasonably eventuate in a lower sales price for a different type, for both home consumption in France and for export.

Thus the plaintiffs make out a powerful prima facie case to the effect that "portion" cheese is a different type of cheese from "standard" Roquefort, differently manufactured out of the same materials and sold at a lower price represented by the entered values here around 1,100 francs per kilo as contrasted with the 1,300 francs per kilo for "standard" at the appraised values. This lends strongly to a conclusion that this portion cheese made especially for the American market should be valued at its export value with no home market value, the sales in France to Sovedipa being treated as restricted sales not constituting a home market although they correspond in amount with the export price.

From an examination of the record in this case we find that there is substantial evidence to support the judgment of the court below. We cannot, of course, weigh the evidence, independently, since, as this court has so often stated, if we find, in reappraisement cases, substantial evidence to sustain the judgment of the lower tribunal, our duty is ended and its judgment must be affirmed.

For the foregoing reasons the judgment of the United States Customs Court is *affirmed.*